07 CV 3915

JUDGE STANTON

PHILLIPS NIZER LLP
666 Fifth Avenue
New York, NY 10103-0084
212-977-9700 Telephone
212-262-5152 Facsimile
Helen Davis Chaitman, HC4266
hchaitman@phillipsnizer.com

*Attorneys for Plaintiff*

MAY 18 2007

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------
LANTANA MENDOCINO, LLC

        Plaintiff                        Docket No.

vs.                                        ECF CASE

WESTLB AG, NEW YORK BRANCH,      **COMPLAINT**

        Defendant.
-----------------------------------------------------------

        LANTANA MENDOCINO, LLC ("Lantana"), for its complaint against WestLB AG, New York Branch ("WestLB"), alleges as follows:

### The Parties

    1.    Lantana is a limited liability company organized under the laws of Delaware with its principal place of business at One Riverwalk Center, Suite 100, 110 South Poplar Street, Wilmington, Delaware 19801. Lantana is managed by Heritage House Resort, Inc., a Delaware corporation whose address is the same as Lantana's address. The principal members of Lantana are David J. Wilk and Duane D. Werb.

    2.    WestLB is a German banking corporation acting through its New York branch, having an office at 1211 Avenue of the Americas, New York, New York 10036.

1006080.1

**Jurisdiction and Venue**

3. This Court has jurisdiction of this action pursuant to 28 U.S.C. § 1332 in that plaintiff is a citizen of the State of Delaware and defendant is a citizen of a foreign state, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

4. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391(a) in that defendant maintains its New York branch in this District and the contract at issue was negotiated in this District and provides that the parties consent to the jurisdiction of this Court.

**Allegations Common to All Claims**

5. As of September 1, 2005, Lantana purchased from HH LLC ("HH") a 33-acre property along the Pacific Ocean in Mendocino, California, which it has developed as a luxury resort called The Heritage House (the "Resort").

6. Lantana obtained financing for the purchase and development of the Resort of $19,500,000 (the "Original Loan") from WestLB, secured by a first mortgage on the Resort. HH provided $7 million of subordinate financing (the "Subordinate Loan"), secured by a second mortgage on the Resort.

7. The WestLB officers who principally handled the negotiation and documentation of the Original Loan were Andrew Stein, Bruce Davidson and Peter Ciaccia.

8. The Original Loan closed within approximately 30 days of WestLB's commitment to make the Original Loan and within 75 days of the first visit to the Resort by Stein, Davidson and Ciaccia.

9. Davidson and Ciaccia visited the site in February 2006 to meet with the contractors who were working on the development of the Resort and to observe the renovations to date and discuss the scope of future construction.

10. In late April 2006, Lantana requested a meeting with Stein and Davidson to update them on the progress of the development and to request consideration of a loan modification to take into consideration the new design of the rooms which was going to increase the overall budget for the project. During that meeting, Stein and Davidson indicated that, at that time, WestLB could not advance any further funds to Lantana and that Lantana had to fund any cost over-runs from additional equity.

11. In May 2006, both Stein and Davidson resigned from WestLB due to dissatisfaction with their annual bonuses and the way they were handled by WestLB. Davidson was the first to leave and went to work with CIT.

12. Shortly thereafter, Stein left and formed Makopastreet Partners LLC, a correspondent for Textron Financial Corporation ("Textron").

13. In the summer of 2006, Stein contacted Wilk and offered to create an opportunity for Textron to provide financing to pay off the Original Loan and the Subordinate Loan.

14. On August 21, 2006, Lantana entered into a letter agreement with Textron for $30 million of senior financing to pay off the Original Loan and to provide additional funds for construction of the Resort and some working capital. Lantana paid Textron a due diligence fee of $100,000 in connection with this commitment.

15. In late August 2006, right after Lantana agreed to work with Textron on the take-out of WestLB, Davidson called Lantana and announced that he had left CIT and

returned to WestLB as the new Executive Director and Head of Hospitality and Leisure Financing for WestLB.

16. In early September 2006, Wilk contacted Davidson and informed him that Lantana had entered into a financing term sheet with Textron and was planning to pay off WestLB in the near term. Davidson expressed his disappointment at Lantana's decision to refinance the Original Loan with Textron but said that he certainly understood Lantana's need to obtain additional financing to complete the Resort.

17. In mid-September 2006, Davidson contacted Wilk and urged him to reconsider whether Lantana was best served by the agreement with Textron. He asked Wilk if the Textron term sheet contained an exclusivity provision prohibiting Lantana from seeking financing from another lender and he told Wilk that, if there was no exclusivity provision, Lantana should allow WestLB to propose aggressively to refinance the Resort.

18. Wilk determined that the Textron term sheet did not contain an exclusivity provision but he explained to Davidson that Lantana had already put in place the due diligence process with Textron and was anxious to move forward quickly to close the new financing.

19. Davidson urged Wilk to tell him what it would take to allow WestLB to provide new financing in lieu of Textron and assured Wilk that he had the ability in his new role as WestLB's Global Head of Hospitality Lending to craft a far better deal for Lantana to refinance the Resort than Textron could. Wilk was interested in this possibility but explained that it was essential that the refinancing close by December 31, 2006 because Lantana had to pay off the Subordinate Loan by February 27, 2007.

4

20. Davidson explained to Wilk that WestLB did not want to lose Lantana as a customer and could move very quickly because it already had all of the information it needed about the Resort and about Lantana. Furthermore, Davidson indicated that he already knew the property well and that all that was required was (a) for an updated appraisal to be completed, which was already under way through Textron, and (b) for another WestLB officer, Vinod Jenveja, who was in charge of the credit committee in WestLB's New York branch, to visit the Resort as quickly as possible. Assuming Jenveja's visit went well and that the appraisal supported the amount requested, Davidson assured Wilk that Lantana's approval by WestLB's credit committee was assured. He assured Wilk that, once West LB delivered a term sheet and letter agreement to Lantana, it would be safe for Lantana to terminate its relationship with Textron because it would get a better financing arrangement from WestLB.

21. In mid to late November 2006, Lantana received word from an independent appraisal firm that it was finalizing an appraisal of the Resort showing a value, as completed, of $52.8 million. Since Jenveja had already visited the Resort, and since the appraisal supported the loan request, Davidson communicated to Wilk that WestLB would issue its term sheet in early to mid-December and would be able to provide $40 million to refinance the Resort. Davidson said that closing by December 31, 2006 would be very difficult, but he felt very comfortable that the refinancing would close within the first couple of weeks of January 2007.

22. On December 15, 2006, WestLB provided to Lantana a letter agreement and term sheet (the "Letter Agreement") for financing of $40 million (the "Promised

Financing"). The Letter Agreement required Lantana to contribute additional equity into the Resort once the Subordinate Loan was paid in full.

23. The day after receiving and signing the term sheet from WestLB, Lantana set up a conference call among Wilk, Werb, Davidson, Maureen O'Connor, the managing member of HH, and Michael Phillips, Esq., HH's attorney, in which Davidson represented to HH and Phillips that credit committee approval was a *fait accompli* and that he and Jenveja "were the credit committee." O'Connor repeatedly questioned Davidson during the conference call and he unequivocally represented to everyone on the call that he had never issued a term sheet that didn't close and he would personally make sure that the refinancing was completed no later than January 31, 2007.

24. Based upon Davidson's repeated assurances that he had the ability to ensure the required approval of WestLB's credit committee for the Promised Financing and that WestLB could definitely close by January 31, 2007, Lantana terminated its relationship with Textron, forfeited its $100,000 due diligence fee, and signed the Letter Agreement with WestLB.

25. Under the Letter Agreement, WestLB undertook to:

Use its commercially reasonable efforts to structure, arrange and document the Loan including the following:

   a) structure and arrange the Loan for the Borrower, including negotiating the final term sheet, performing and completing due diligence and preparing definitive documentation for the Loan; and

   b) manage all aspects of a syndication for the Loan, including without limitation the timing of all offers to prospective lenders, arrangement of road show presentations and other meetings between the Borrower and lenders as required, the acceptance of commitments from lenders and the determination of the amounts offered and the compensation provided.

6

> Upon completion of due diligence (the results of which must be satisfactory to WestLB in its sole discretion), WestLB will seek to obtain all necessary or desirable internal approvals to provide the Loan, but also to assemble, using commercially reasonable efforts, a syndicate of financial institutions to provide a portion of the Loan.

26. Davidson had inserted into the Letter Agreement (at 2) an exclusivity provision which prohibited Lantana from pursuing financing with any lender other than WestLB, in order to prevent any other lender from doing what Davidson had done in inducing Lantana to terminate its agreement with Textron, based upon the Promised Financing. This provision reads as follows:

> Each of the Borrower and the Sponsor agrees [Lantana] agrees that until the termination of this Mandate Letter by the parties hereto, no other financial institution is or will be authorized or be retained by the Borrower or the Sponsor to perform services, on behalf of the Borrower and the Sponsor, that are similar to those of the type which WestLB is engaged to perform in connection with the engagement hereunder.

27. WestLB's counsel for the closing of the Promised Financing was Katten Muchin Rosenman LLP ("Katten Muchin").

28. Throughout January 2007, Lantana contacted Davidson constantly to ensure that the closing would occur in the timeframe represented and fully cooperated with Sheri Chromow, Esq., of Katten Muchin, to provide all of the necessary documentation for a January 31, 2007 closing.

29. There was little or no activity from WestLB or Davidson throughout the first half of January 2007 and Lantana became concerned that the process was not moving as expeditiously as it did for the Original Loan.

1006080.1

30. In mid-January 2007, Wilk attended the American Lodging Investment Summit ("ALIS") in Los Angeles and spoke there with Davidson and with Peter Pasqua, Davidson's right hand executive.

31. Davidson and Pasqua introduced Wilk to Tom Richard, CEO of Merritt & Harris ("MH") and indicated that the only remaining item necessary to complete for a closing was a study from MH that confirmed the cost to complete budget for the remainder of the project. Pasqua then informed Wilk at the ALIS: "Don't worry. We'll get this done for you." Pasqua told Wilk he was going to cancel a planned trip to Mexico in order to work on the finalization and closing of the Promised Financing. He stated that Davidson had just that day asked him to take on this responsibility and "he had a lot of work to do in order to get it closed."

32. Based on the statements of Pasqua and Davidson, Lantana agreed to retain MH to do the necessary analysis of the budget for the redevelopment of the Resort.

33. After the ALIS, Lantana sent many emails to WestLB constantly inquiring about the progress towards closing which were not answered or responded to. Lantana kept trying to ascertain why there were no closing documents by the 20th of January if there was a closing that was supposed to occur by January 31, 2007. Because of the previous closing experience with WestLB, this lack of clarity and progress seemed uncharacteristic based on past performance.

34. On January 29, 2007, Katten Muchin provided Lantana's counsel with draft loan documents for review and preparation for closing. Lantana made revisions to the loan documents and sent the revised documents back to Katten Muchin within 24 hours.

35. On that same day, Davidson called Wilk and told him that the Katten Muchin lawyer responsible for the closing, Mr. Hoagland, had been killed in an automobile accident and the closing process was going to be delayed due to the funeral and shock of Mr. Hoagland's untimely and tragic demise. Davidson indicated that the closing might be delayed by 7 to 10 days.

36. On January 30, 2007, Wilk spoke to Davidson and inquired as to whether Davidson could provide a definite closing date for the Promised Financing since HH was gravely concerned that the January 31, 2007 deadline was going to pass without a closing. Davidson stated that he was leaving for Miami to attend the Super Bowl and that he wouldn't be back in the office until February 5, 2007. He said that nothing was going to happen before February 5, 2007.

37. Katten Muchin then sent out a list of 13 or 14 "critical path" items that were required prior to closing which Lantana responded to within 3 to 4 hours of receiving the request.

38. On or around February 6, 2007, almost a week after the date that was represented by Davidson for closing, Lantana received an email stating that the credit committee had some items of concern that needed to be addressed.

39. Lantana immediately addressed all the items and continued to press Davidson and Pasqua for a closing date. HH was extremely upset with Lantana and WestLB due to the representations that had been made by Davidson about a January 31, 2007 closing which had passed many days ago.

40. In view of the fact that the credit committee was still asking questions about the project, contrary to the representations made to Lantana and HH, Lantana

9

1006080.1

became extremely concerned that the situation had been misrepresented and that the refinancing was being mismanaged by Davidson and Pasqua internally.

41. Lantana sent a number of emails to WestLB seeking assurance that the Promised Financing was still in place. Davidson assured Wilk with the following comments:

> I wouldn't be spending time working on this deal if I didn't think it would close.

> Don't worry. We'll get this done for you; we just have to go through our process.

42. Despite Davidson's repeated assurances, with the passage of time Lantana became concerned that the Promised Financing would never materialize.

43. After weeks of uncertainty mixed with a lack of responsiveness to multiple emails and phone calls by Wilk expressing his concern to Davidson about WestLB's failure to close, and being one week away from the maturity of the Subordinate Loan, Wilk implored Davidson to set a date for the closing because of the critical need to pay off the Subordinate Loan and to fund the development of the Resort.

44. After days of pressing and chasing Davidson, on February 20, 2007, Davidson called Wilk and Werb to inform them that he had received approval from the credit committee to pay off the Subordinate Loan by the due date of February 27, 2007, even if WestLB was unable to close on the balance of the Promised Financing by February 27, 2007. He said that Lantana would have to infuse additional equity and work through the MH analysis before WestLB was able to close on the balance of the Promised Financing.

45. Based upon Davidson's representations and with his specific consent, Wilk and Werb telephoned O'Connor and communicated to her that WestLB would definitely advance the funds to pay off the Subordinate Loan by February 27, 2007.

46. After assuring Lantana and HH of the payoff of the subordinate loan, the next day, during the afternoon of February 21, 2007, Davidson and Pasqua telephoned Wilk and said "we ran into a brick wall with credit and won't be able to fund anything next week." They nevertheless assured Wilk that WestLB would still close on the Promised Financing but they needed some more time to work through the MH analysis.

47. On February 22, 2007, Lantana sent an email to WestLB imploring it to consider the impact on Lantana of the refusal to pay off the Subordinate Loan, as promised, by February 27, 2007.

48. The February 23, 2007 response from WestLB was authored by Timothy Little of Katten Muchin who claimed, incorrectly, that Lantana had not fulfilled some of the preconditions to lending. Nevertheless, Little represented that Pasqua and Davidson were willing to re-submit the transaction to the credit committee.

49. On February 27, 2007 Lantana met with Connor to discuss the fact that WestLB, contrary to its representations, was not going to pay off the Subordinate Loan by February 27, 2007. During this meeting, Wilk telephoned Davidson to obtain his assurance that WestLB was still willing to close on the Promised Financing. Davidson assured Wilk that WestLB would close on the Promised Financing. Wilk asked Davidson if Lantana should pursue other financing alternatives and Davidson said "No. We will get this deal done for you."

50. Based on this assurance, Lantana entered into a Forebearance and Extension Agreement with HH in which Lantana relinquished substantial rights.

51. Thereafter, Lantana continued to work with Katten Muchin to provide everything WestLB requested in order to finally close on the Promised Financing.

52. On numerous occasions, Wilk called Davidson to repeat his question as to whether Lantana should seek alternative financing and each time Davidson assured him that WestLB would close on the Promised Financing. Davidson repeatedly told Wilk: "I would not be spending my time working on this if I didn't think I could get it closed."

53. During the first week of March, Wilk informed Davidson and Pasqua that Lantana had raised the equity that WestLB had set as one of the conditions precedent to funding the Promised Financing in excess of the payoff of the Subordinate Loan.

54. In addition, Lantana contacted Mike Dwyer and his associates from MH to find out what else MH needed in order to satisfy the requirements of WestLB.

55. Throughout March 2007, Wilk constantly sought assurance from Davidson and Pasqua that WestLB was communicating with MH and getting whatever information the credit committee allegedly needed to approve the Promised Financing.

56. On March 16, 2007, Pasqua sent an email to Wilk stating that the information Lantana had provided to WestLB regarding budgets and other construction issues was insufficient. Lantana immediately re-sent to Pasqua and Davidson emails that had previously been sent containing the allegedly missing information.

57. At this point, both Katten Muchin and WestLB had stated that the only open items related to the budget and certain construction issues.

58. On March 27, 2007, Chromow wrote to Wally Wetterman, Lantana's counsel, that WestLB was reviewing the budget and construction documents that had been sent to WestLB prior to March 16, 2007 and would get back to Lantana as soon as possible. In fact, neither Katten Muchin nor WestLB ever communicated with Lantana or its counsel concerning the alleged open issues relating to the budget and construction documents.

59. On April 13, 2007, Pasqua emailed Wilk that the Letter Agreement was terminated by WestLB because it expired by its terms on January 31, 2007.

60. By not disclosing to Lantana, during the 11-week period from January 31, 2007 to April 13, 2007, that WestLB considered the Letter Agreement terminated as of January 31, 2007, WestLB prevented Lantana from seeking alternate financing and wrongfully held Lantana to the exclusivity provision of the Letter Agreement.

61. WestLB's conduct put Lantana in a position where it was in danger of breaching its obligations to HH and to the contractors performing work on the Resort.

**First Claim for Breach of Contract**

62. Lantana repeats the allegations heretofore stated.

63. Under the Letter Agreement, WestLB had an obligation to act in a commercially reasonable manner to structure, arrange and document the Promised Financing.

64. By its conduct, WestLB breached this obligation.

65. Lantana has suffered damages exceeding $10 million by virtue of WestLB's breach of contract.

### Second Claim for Breach of the Obligation of Good Faith and Fair Dealing

66. Lantana repeats the allegations heretofore stated.

67. Under New York law, which is controlling under the Letter Agreement, WestLB had an obligation of good faith and fair dealing towards Lantana which required WestLB not to frustrate the essential purpose of Lantana in entering into the Letter Agreement.

68. WestLB induced Lantana to terminate its anticipated financing from Textron and forfeit the $100,000 due diligence fee it had paid Textron by promising Lantana that WestLB's credit committee approval was a perfunctory process and that WestLB would close on the Promised Financing by January 31, 2007.

69. WestLB knew that Lantana's essential purpose in terminating its relationship with Textron and entering into the Letter Agreement was to obtain the Promised Financing by January 31, 2007.

70. Having succeeded in causing Lantana to terminate its relationship with Textron, WestLB then conducted itself in such a manner as to frustrate Lantana's essential purpose in entering into the Letter Agreement. Thus, WestLB violated its obligation of good faith and fair dealing under New York law.

71. WestLB further frustrated Lantana's essential purpose in entering into the Letter Agreement by concealing from Lantana that it did not have credit committee approval to close on the Promised Financing.

72. Lantana suffered damages exceeding $10 million as a result of WestLB's conduct.

### Third Claim for Fraud

73. Lantana repeats the allegations heretofore stated.

74. Davidson induced Lantana to terminate its relationship with Textron and enter into the Letter Agreement based upon specific representations that he, as Head of Hospitality and Leisure Financing for WestLB, could guaranty credit committee approval for the Promised Financing so that the closing could take place no later than January 31, 2007 (the "Misrepresentations").

75. Thereafter, Davidson induced Lantana to believe that WestLB intended to close on the Promised Financing after January 31, 2007 based upon specific representations that WestLB would close on the Promised Financing and/or specific representations that WestLB would pay off the Subordinate Loan (the "Further Misrepresentations")

76. The Misrepresentations and Further Misrepresentations were false at the time they were made.

77. Davidson knew the Misrepresentations and Further Misrepresentations were false at the time they were made.

78. Davidson made the Misrepresentations and Further Misrepresentations with the intention that Lantana would rely upon them, terminate its relationship with Textron, and look only to WestLB for the Promised Financing.

79. Lantana reasonably relied upon the Misrepresentations and Further Misrepresentations and has suffered damages exceeding $10 million.

80. Davidson made the Misrepresentations and Further Misrepresentations as an officer of WestLB and with the intent of wrongfully enriching WestLB at Lantana's expense.

81.     WestLB is liable for any false or fraudulent statements made by its officers, including the Misrepresentations and Further Misrepresentations.

82.     WestLB is liable for the damages suffered by Lantana.

### Fourth Claim for Reckless Misrepresentation

83.     Lantana repeats the allegations heretofore stated.

84.     If the Misrepresentations and Further Misrepresentations were not made with actual fraudulent intent, they were made with reckless negligence by Davidson.

85.     WestLB had an obligation to communicate with Lantana honestly concerning the Promised Financing and the negotiations leading up to the Letter Agreement.

86.     WestLB breached its obligation to communicate with Lantana honestly by virtue of Davidson's recklessly false Misrepresentations and Further Misrepresentations.

87.     Lantana suffered damages as a result of WestLB's recklessness in an amount exceeding $10 million.

WHEREFORE Lantana demands judgment:

1.     On the first claim for compensatory damages resulting from WestLB's breach of the Letter Agreement;

2.     On the second claim for compensatory damages resulting from WestLB's breach of its obligation of good faith and fair dealing towards Lantana;

3.     On the third claim, for compensatory and punitive damages against WestLB for the fraudulent misrepresentations made by Davidson;

4.     On the fourth claim, for compensatory and punitive damages against WestLB for reckless misrepresentations made by Davidson;

5. For such other relief as the Court deems just and proper.

May 17, 2007

                PHILLIPS NIZER LLP

                By _____
                       Helen Davis Chaitman

                666 Fifth Avenue
                New York, NY 10103-0084
                (212) 841-1320

                Attorneys for Lantana Mendocino, LLC

1006080.1